UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION

JOHN WRIGHT,                          )
                                      )
            Plaintiff                 )
                                      )
      v.                              ) Case No. 4:10 cv 35
                                      )
MICHAEL J. ASTRUE,                    )
Commissioner of Social Security       )
                                      )
            Defendant                 )

## REPORT AND RECOMMENDATION

This matter is before the court on the petition for judicial review of the decision of the Commissioner of Social Security filed by the claimant, John Wright, on January 12, 2010. For the reasons set forth below, the court RECOMMENDS that the decision of the Commissioner be AFFIRMED IN PART and REMANDED IN PART.

## Background

The claimant, John Wright, applied for Supplemental Security Income on August 23, 2005, alleging a disability onset date of January 2, 1997. His claim initially was denied on March 16, 2006, and also upon reconsideration on June 5, 2006. (Tr. 44-45) Wright requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 46) A hearing before ALJ James R. Norris was held on July 8, 2009, at which Wright, medical expert Mark I. Ober-lander, Ph.D., medical expert Lloyd K. Stump, M.D., and voca-tional expert Gail K. Corn testified. (Tr. 19, 342-371)

On August 7, 2009, the ALJ issued his decision denying benefits. (Tr. 19-32) The ALJ found that Wright was disabled from January 2, 1997, through the date he issued his decision. However, he determined that if Wright ceased his substance abuse, he would not be disabled. (Tr. 19-32) Therefore, Wright was not entitled to SSI under the terms of the Act. (Tr. 19-32) Following a denial of Wright's request for review by the Appeals Council, he filed his complaint with this court.

Wright was born on April 4, 1963, making him 46 years old on the date of the ALJ's decision. (Tr. 32, 44) Wright was single and resided by himself in a house owned by his brother and sister-in-law. (Tr. 356-57) He lived with his mother before she died, and family members checked in on him twice a day. (Tr. 183) He has an eighth grade education and last worked as a construction laborer in 2003. (Tr. 102, 183)

Wright was diagnosed with epilepsy, Cholestematoma, pulmonary disorder, adjustment disorder with depression and anxiety, and personality disorder. He also had a low IQ, substance abuse disorder, decreased hearing, balance problems, and shortness of breath.

More specifically, Wright had a "dead left ear" from Cholestematoma. As a result of this condition, he had profound nerve hearing loss and persistent balance problems in walking and

standing.  (Tr. 307)  In 2006, his treating physician wrote that his condition was not expected to improve given the severity of the disease.  (Tr. 180) The nerve damaged caused by the tumor made Wright's face twitch uncontrollably.  (Tr. 180)

In January 2006, Wright saw Dr. James Kenny, Ph.D., for a consultative mental status examination.  Dr. Kenny described Wright as dirty, scruffy, disheveled, unwashed, emaciated with sunken eyes, fungus rotted fingernails, a stale aroma, coughed, had a facial twitch, was missing teeth, often shaking, confused, and disoriented.  (Tr. 183)  He often gagged and vomited and stared out the window, unaware of his surroundings.  (Tr. 183, 185) He was slow to respond and unable to sit still, focus, or remember things.  (Tr. 183)  Wright reported that he heard voices telling him to do "weird crazy things" and that he saw visions of people.  (Tr. 24) Wright performed poorly during the mental status exam, and Dr. Kenny diagnosed him with Major Depressive Disorder; Polysubstance Dependence, in remission; Alcohol Dependence; and Personality Disorder.  (Tr. 184)  He assigned Wright a global assessment functioning (GAF) score of 35, indicating some impairments in reality testing or communication or major impair-

ments in several areas, such as work or school, family relations, judgment, thinking, or mood.[1] (Tr. 184)

In February 2006, Dr. Kenny administered the Wechsler Adult Intelligence Scale IQ. Wright achieved a Verbal IQ score of 49, a Performance IQ score of 51, and a Full Scale IQ score of 45, which fell at the 0 percentile and within the range of mental retardation. (Tr. 185) Dr. Kenny stated that Wright was quick to state "I don't know" and would become irritated when prompted to continue. (Tr. 185) Dr. Kenny was unable to discern whether Wright's low score was due to his intelligence or lack of cooperation. (Tr. 185)

In May 2009, Dr. Gary Durak performed a consultative psychological examination on Wright. (Tr. 280-283) Wright informed Dr. Durak that he had a problem with seizures, the most recent one occurring two months earlier, and that he had a history of substance abuse and mental illness in his biological family, but that he did not personally have a history of mental health treatment or substance abuse. (Tr. 280) Dr. Durak completed a Medical Source Statement for the Ability to do Work Related Activities. He stated that Wright had marked difficulties making judgments on complex work-related decisions. (Tr. 25, 282) Dr. Durak con-

---

[1] The GAF scale measures a "clinician's judgment of the individual's overall level of functioning." Am. Psychiatric Ass'n, Diagnosis and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision, 32, 34 (2000) (DSM IV-TR).

cluded that Wright had an adjustment disorder with depression and anxiety, as well as a personality disorder, not otherwise specified, with learning disabilities to be ruled out. (Tr. 282) Dr. Durak assigned Wright a global assessment of functioning score of 55, indicating that Wright had moderate symptoms or moderate difficulty in social, occupational, or school functioning. (Tr. 282)

At the hearing, the first medical expert, Dr. Mark Oberlander, testified that the record included evidence of three mental impairments: an organic disorder that caused Wright's seizures, dizziness, and vertigo; a personality disorder; and a substance abuse disorder from alcohol and marijuana. (Tr. 344) Dr. Oberlander testified that he did not see evidence of a significant period of time where there had been a remission of Wright's substance abuse and agreed with the state agency doctors that Wright's condition met Listing 12.09 for substance abuse disorders. (Tr. 344-45) The ALJ also questioned Dr. Oberlander regarding the validity of the IQ test administered by Dr. Kenny. (Tr. 346) Dr. Oberlander responded that based on his experience the test scores were invalid and that the level of cooperation and effort exerted during the exam suggested malingering. (Tr. 346)

Contrary to this opinion, Dr. Kenny provided that "What is misleading is that John tends to be curt and abrasive with people, and even non-cooperative.  He irritates those who might aid him and may look like a malingerer.  This is a not uncommon response.  People suffering severe deficits give up trying and express anger at those who attempt to help."  (Tr. 181) When questioned about this statement, Dr. Oberlander replied that it was one explanation.  (Tr. 346)

Dr. Stump also testified as a medical expert at Wright's hearing.  He explained that Wright experienced epilepsy but that his EEG testing was normal.  (Tr. 347) An MRI had shown an increased signal in the right thalamus of the brain that was not a contributor to epilepsy.  (Tr. 347-48)  Dr. Stump testified that a physician in January 2006 stated that Wright's seizure disorder was secondary to alcohol withdrawal.  (Tr. 341) When questioned about evidence of an organic brain disorder, Dr. Stump replied "What that has to do with it, I don't know because nobody has ever commented on it from a standpoint of clinical setting in this case."  (Tr. 351)  Dr. Stump indicated that Wright's October 2005 pulmonary function tests were fairly low, but he concluded that this study was invalid because Wright's February 2006 pulmonary function tests yielded better results.  (Tr. 348) Dr. Stump also stated that Wright's dizziness problem was caused by a

tumor in his inner ear but that this problem had been resolved. (Tr. 349) Based on his review of the record, Dr. Stump believed that Wright could not perform medium work, that he could meet all the requirements of light work, and that Wright should not work at heights, around dangerous machinery, fire, or water. (Tr. 355) Dr. Stump concluded that Wright did not meet or equal a Listing. (Tr. 351)

Wright testified at the hearing in regards to his abilities and daily activities. (Tr. 357-365) Wright stated that he was unable to work because he had seizures and was short of breath. (Tr. 357) He explained that the seizures occurred without warning, sometimes weekly and sometimes twice a month, both at night and during the day. (Tr. 357-58) He had auditory hallucinations and bad dreams and sometimes heard voices that told him to kill people. (Tr. 360) He got irritated easily, felt worthless, and stayed in bed all day to avoid people. (Tr. 185) Wright's ability to read and write was greatly limited, and he had difficulty following oral instructions. (Tr. 132, 183, 361) He stated that he could write his name but that his brother had to read his mail to him. (Tr. 361) He had a hard time remembering, often had questions repeated two or three times, and had difficulty sitting still and focusing. (Tr. 132, 183)

Wright testified that he was unable to take care of his house and that his cousin cleaned it for him. (Tr. 365) He sometimes mowed the lawn, but usually his neighbor did. (Tr. 363) He had family members do his laundry and wash his dishes, and he could not take care of his finances. (Tr. 157, 269, 365) He could not cook and ate sandwiches and soup heated in the microwave. (Tr. 22-23) He could not stand or walk for long periods because he had shortness of breath, fell often, and lost control of his bladder. (Tr. 269) On a typical day, he woke up, drank a soda, and watched television. (Tr. 362) He could not drive and never had a driver's license. (Tr. 360) He consumed 12 beers a day and had done so since 1975. (Tr. 267) He reported that he was intoxicated seven days a week, and 30 days in the past month. (Tr. 116) He also smoked a pack and a half of cigarettes a day. (Tr. 116)

Considering the testimony provided by Wright and the two medical experts, the ALJ posed a series of hypothetical questions to the vocational expert to determine if someone with Wright's limitations could sustain gainful employment. (Tr. 367) The VE responded that a 44 year old with a limited education and past work experience as a construction worker could perform unskilled light work. However, he could not work at dangerous heights or around fire or water and could not operate a motor vehicle. (Tr.

367) Although such an individual could not perform Wright's past relevant work, he could work as an assembler (5,000 positions), cleaner (6,000 positions), and hand packager (7,000 positions). (Tr. 367-68)

In his decision, the ALJ discussed the five-step sequential evaluation process for determining whether an individual was disabled. (Tr. 20-21) In step one, the ALJ found that Wright had not engaged in substantial gainful activity since he applied for SSI. (Tr. 21) At step two, the ALJ found that Wright had the following severe impairments: nerve hearing loss in the left ear; seizure disorder; pulmonary disorder; major depressive disorder; polysubstance dependence, in remission; alcohol dependence; and dependent personality disorder. (Tr. 21-22) At step three, the ALJ found that Wright's impairments met Listings 12.02 (organic mental disorders) and 12.09 (substance abuse disorders) and that Wright therefore was disabled. (Tr. 22-24) The ALJ concluded that Wright had marked limitations in the areas of daily living, social functioning, concentration, persistence, and pace, and that Wright did not have any episodes of decompensation. (Tr. 22-23) The ALJ determined that if Wright ceased abusing substances he still would have severe impairments but that his impairments would not meet or medically equal any of those included in the Listing of Impairments. (Tr. 24-26)

In determining that Wright would not be disabled if he ceased his substance abuse, the ALJ analyzed Wright's ability to function in four areas. (Tr. 25) In conducting this analysis, the ALJ assessed Wright's abilities according to his reported activities during the period of time he disclosed to Dr. Durak that he refrained from abusing substances. (Tr. 25) First, the ALJ considered the area of daily living and found that Wright would have a mild limitation if he stopped abusing substances. (Tr. 25) He noted that there was little indication that Wright's mental impairments affected his ability to perform activities of daily living. (Tr. 25) Second, the ALJ considered social functioning. (Tr. 25) The ALJ determined that Wright ceased his substance abuse in May 2009, because he reported to Dr. Durak during his consultative examination that he did not abuse substances. (Tr. 25) Dr. Durak reported that during the examination Wright had poor eye contact but that he was cooperative, motivated, and able to interact with the examiner. (Tr. 25) Wright had no hobbies but was able to interact with friends. (Tr. 25) Relying on this information, the ALJ determined that Wright's ability to function socially was only mildly impaired. (Tr. 25) Third, the ALJ considered Wright's concentration, persistence, and pace. (Tr. 25) Dr. Durak reported that Wright was oriented and motivated, had difficulties with calculations,

his memory was impaired, but that he was alert and his concentration was adequate.  (Tr. 25) Wright's speech was relevant and coherent, and his thought processes and content were within normal limits. (Tr. 25) Although the ALJ believed Wright had problems in this area, he found that they were mild.  (Tr. 25) The fourth functional area the ALJ considered was whether Wright experienced episodes of decompensation.  (Tr. 26) The ALJ found that Wright would not experience any episodes if he was not abusing substances.  (Tr. 26)

The ALJ concluded that Wright would have the residual functional capacity (RFC) to perform light unskilled work that did not require him to work around unprotected heights, dangerous machinery, fire, or water, and that did not require him to operate automotive machinery if he received treatment for his substance abuse problem.  (Tr. 27)  In reaching this determination, the ALJ explained that he first considered Wright's subjective complaints.  (Tr. 28) Wright testified that he had seizures once a week or twice a month, that he experienced shortness of breath and low energy, that he was hard of hearing and had difficulty balancing, and that he heard voices.  (Tr. 28) Wright could write his name, but he could not write a letter or understand detailed directions.  (Tr. 28) The ALJ found that Wright was not so limited when he was not abusing substances because he

reported to Dr. Durak that he was able to wash dishes, sweep the floor, dress, groom, bathe, cook, and complete other activities of daily living.  (Tr. 30)

Next, the ALJ considered the objective medical evidence. (Tr. 28) The ALJ explained that Wright continued to have a seizure disorder, breathing disorder, loss of hearing, and possible balance problems.  (Tr. 28) He was taken to the emergency room in July 2005, apparently due to extreme intoxication. (Tr. 28) An examination found that he had full strength, active reflexes, long-standing alcoholism and seizures, mostly clustered around an alcoholic binge, and most likely related to withdrawal. (Tr. 28) Wright had a normal EEG study.  (Tr. 28) In April 2008, his lungs were clear, he was neurologically intact, he had full strength, and his gait, senses, and coordination were normal. (Tr. 28)  An MRI of his brain showed a small increase signal in the right thalamus, the significance of which was not clear. (Tr. 28)  Although Wright alleged shortness of breath, his lungs were clear, his breath sounds were normal and symmetric, there were no wheezes, rhonchi, or crackles noted.  (Tr. 29) The results of his pulmonary test were low, but the examiner noted that Wright did not exert maximal effort. (Tr. 29) A chest x-ray revealed changes of diffused bilateral emphysema, and a subsequent pulmonary function test yielded better results.  (Tr. 29)

The ALJ concluded that the medical evidence did not show a pattern of seizures requiring frequent treatment and that he would reduce Wright's functional capacity to light work to accommodate his shortness of breath. (Tr. 29)

The ALJ disagreed with Wright's treating physician, Dr. Steven R. Beaver, regarding Wright's ability to stand, walk, lift, push, pull, squat, and do normal housework. He concluded that Dr. Beaver's report was not based on substantial evidence and did not identify any diagnostic findings or clinical signs. (Tr. 30) The ALJ assigned minimal weight to Dr. Kenny's opinion that Wright was incapable of performing useful work because Dr. Kenny only saw Wright on two occasions and did not treat Wright often enough to be considered a treating physician. (Tr. 30) The ALJ assigned the greatest weight to Dr. Durak in determining Wright's RFC.

With the RFC determined, at step four the ALJ found that Wright could not perform his past relevant work. (Tr. 31-32) At step five, the ALJ found that considering Wright's age, education, work experience, and RFC, there were a significant number of jobs available in the national economy that he could perform, including assembler (5,000 jobs), cleaner (6,000 jobs), and hand packer (7,000 jobs). (Tr. 31-32)

## Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.  42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."). Schmidt v. Barnhart, 395 F.3d 737, 744 (7th Cir. 2005); Lopez ex rel Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852, (1972)(quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). See also Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Sims v. Barnhart, 309 F.3d 424, 428 (7th Cir. 2002).  An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law.  Rice v. Barnhart, 384 F.3d 363, 368-69 (7th Cir. 2004); Scott v. Barnhart, 297 F.3d 589, 593 (7th Cir. 2002).  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues."  Lopez, 336 F.3d at 539.

Supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. 20 C.F.R. §416.920. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. §416.920(b). If he is, the claimant is not disabled and the evaluation process is over. If he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." 20 C.F.R. §416.920(c). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. §401, pt. 404, subpt. P, app. 1. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining

capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of his past work. If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled. 20 C.F.R. §416.920(e). However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy. 42 U.S.C. §423(d)(2); 20 C.F.R. §416.920(f).

Wright first argues that the ALJ erred in finding that he did not meet Listing 12.05 because his determination was not based on substantial evidence of record. For a claimant to show that he meets a listed impairment, he must demonstrate that his impairment meets each required criterion. Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999). A condition that meets only some of the required medical criteria, "no matter how severely," will not qualify as meeting a listing. Sullivan v. Zebley, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).

Section 12.00(A) of the Social Security Regulations describes the structure of Listing 12.05. Specifically, the regulations state that if an "impairment satisfies the diagnostic

description in the introductory paragraph and any one of the four sets of criteria," an impairment will meet the listing. 20 C.F.R. §401, pt. 404, subpt. P, app. 1 §12.00(A). Listing 12.05(C) provides in relevant part:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e, the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> \* \* \*
>
> B.   A valid verbal, performance, or full scale IQ of 59 or less; or
>
> C.   A valid verbal, performance, or full scale IQ score of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.
>
> 20 C.F.R. §401, pt. 404, subpt. P, app. 1 §12.05(C)

Thus, the structure of Listing 12.05 indicates that a claimant must show both that he meets the Listing's definition of mental retardation, and that he meets the required severity level by satisfying the requirements in either A, B, C, or D. Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006).

In order to meet Listing 12.05(C), there first must be evidence that "subaverage intellectual functioning" manifested prior to age 22. If a claimant meets the definition of mental retardation, then the analysis shifts to whether the claimant's mental retardation is sufficiently severe to qualify as a disability, which is met when the requirements in either A, B, C, or D are proven. 20 C.F.R. §401, pt. 404, subpt. P, app. 1 §12.05. If the individual is mentally retarded as defined by the regulations and has an IQ of less than 60, the claimant is considered disabled under Listing 12.05 without further inquiry. 20 C.F.R. §401, pt. 404, subpt. P, app. 1 §12.05(B). However, an IQ over 60 is insufficient to establish disability under Listing 12.05 alone, since people with low IQ's may be able to perform gainful employment. Novy v. Astrue, 497 F.3d 708, 709 (7th Cir. 2007). Thus, a claimant with an IQ between 60 and 70 also must show a "physical or other mental impairment" that creates an additional, and significant, limitation on his ability to work. 20 C.F.R. §401, pt. 404, subpt. P, app. 1 §12.05(C). See Maggard, 167 F.3d at 380 (same).

The circuit courts presume that a person's IQ remains stable, absent evidence of a change in intellectual function. Muncy v. Apfel, 247 F.3d 728, 734 (8th Cir. 2001). See, e.g., Guzman v. Bowman, 801 F.2d 273, 275 (7th Cir. 1986)(absent evi-

dence to the contrary, IQ test taken subsequently "should be assumed" to reflect IQ during the insured period); Branham v. Heckler, 775 F.2d 1271, 1274 (4th Cir. 1985)(fact that no IQ test was taken earlier in life "does not preclude a finding of retardation"). However, a stable IQ, albeit low, does not necessarily equate to a showing of mental retardation as defined by Listing 12.05(C) before age 22. The Seventh Circuit has indicated that people with low IQs may be able to perform work. Novy, 497 F.3d at 709.

Pursuant to regulations, the ALJ is allowed to consider evidence concerning past work history in assessing "ability or inability to function in a work setting." 20 C.F.R. §401, pt. 404, subpt. P, app. 1 §12.00(A). See Adkins v. Astrue, 226 Fed. Appx 600, 605 (7th Cir. 2007)(while low IQ scores might be an indicator of retardation, other items, "including . . . employment history, must be considered and weighed;" claimant failed to prove deficits prior to age 22 even though school records were submitted showing only eighth grade was completed, due in part to his long work history); Maggard, 167 F.3d at 380 (no mental retardation, even though a low IQ score existed, in part due to claimant's "ability to withstand the stress and pleasures associated with a day-to-day work activity"). Courts considering whether an individual meets Listing 12.05 generally have focused

their analysis on the claimant's IQ scores, education, work experience, activities, and ability to perform daily life activities.  See Adkins, 226 Fed. Appx. at 605; Maggard, 167 F.3d at 380.  The claimant's activities of daily living, work experience, and education must be consistent with his low IQ score to satisfy Listing 12.05. Adkins, 226 Fed. Appx. at 605.

Here, Wright's limited work history and inability to perform many functions of daily life were consistent with his claim that he met Listing 12.05.  Wright completed school through eighth grade and was enrolled in special education classes.  Despite his eighth grade education, his ability to read and write was substantially limited beyond writing his own name.  He was unable to care for himself, clean his house, maintain his finances, and had relatives check in on him twice a day.  He had difficulty tying his shoes, focusing, responding to questions, and taking oral directions.  Furthermore, Wright's IQ score fell well below the average required to establish mental retardation under Part B of Listing 12.05, and the court must assume that his IQ remained stable since the age of 22.  See Muncy, 247 F.3d at 734 (explaining that the court presumes a person's IQ remains stable).  Although the ALJ attempted to bolster his decision to discredit Wright's IQ score by explaining that he relied on Dr. Durak's opinion that Wright was malingering, the ALJ's determination was

based on the opinion of a non-examining physician who was not present at the time the IQ test was administered. It was purely speculative to rely on the opinion of a physician who was not present at the administration of the IQ test to conclude that Wright was not cooperative, especially when Dr. Kenny did not invalidate the test results for malingering. If the ALJ had concerns regarding whether Wright had made a bona fide effort in taking the test, the proper course would have been to order another IQ test. Wright's score fell far below average, and even if it was higher in a subsequent exam, it likely would have fallen within the range qualifying him as mentally retarded.

Furthermore, even if the ALJ relied on Dr. Oberlander's opinion that Wright's IQ score was invalid, neither Dr. Oberlander nor any other evidence of record suggested that Wright's true IQ score was within a normal range, so that he would not satisfy Part B of Listing 12.05. It was the ALJ's duty to develop the record fully and to support his decision with substantial evidence. Because the ALJ failed to explain how Wright's inability to care for himself, limited work experience, illiteracy, and difficulty following directions and responding were inconsistent with his low IQ score, and none of the evidence suggested that Wright had an IQ score that placed him outside the range of mentally retarded as contemplated by Part B of Listing 12.05, the

ALJ's decision to discredit Wright's IQ score and find that Wright did not satisfy Listing 12.05 was not adequately supported and based on substantial evidence as required.

Additionally, if Wright in fact was malingering and his true IQ score was elevated as much as 15 to 25 points to a range between 60 and 70, Wright still would qualify as disabled under Listing 12.05. When determining Wright's severe impairments, the ALJ concluded that Wright had an organic brain disorder. Part C of Listing 12.05 provides that a claimant who has an IQ score between 60 and 70 and an organic brain disorder is disabled under the Act. Because the record was devoid of evidence of any sort, including medical opinions, that Wright's IQ score was above 70, the ALJ failed to base his determination on substantial evidence of record, and his determination must be remanded.

Next, Wright argues that the ALJ failed to fully develop the case concerning his illiteracy. However, Wright did not explain how this would affect the ultimate outcome of the ALJ's decision. The jobs the VE testified that someone of Wright's capabilities could perform did not involve reading or writing. The court will not remand a decision on an issue that bears no weight on the ultimate disposition of the case. Borth v. Commissioner of Social Security, 2010 WL 786007, *8 (C.D. Ill. March 4, 2010)

("Harmless errors are those that do not affect the ALJ's determi-
nation that a claimant is not entitled to benefits.").

Finally, Wright objects to the ALJ's conclusion that his
substance abuse was a contributing factor material to finding a
disability.  If such abuse was the cause of his disability, he
was barred by statute from obtaining benefits.  42 U.S.C.
§423(d)(2)(C). When an applicant for disability benefits both has
a potentially disabling illness and is a substance abuser, the
issue for the ALJ is whether, were the applicant not a substance
abuser, he still would be disabled. 20 C.F.R. §404.1535(b)(1). If
so, he is considered disabled independent of the substance abuse
and entitled to benefits. 20 C.F.R. §404.1535(b)(2)(ii); Kangail
v. Barnhart, 454 F.3d 627, 628-29 (7th Cir. 2006).  In rendering
this decision, the ALJ must consider any previous instances of
the claimant's sobriety, looking at what abilities the claimant
has when he is not dependent on drugs and alcohol.  See Kangail,
454 F.3d at 629-30 (considering claimant's ability to hold a job
after substance abuse resolved).  Where there is no evidence of a
period of sobriety, the ALJ must find that the dependence is not
a significant contributing factor.  Jarmon v. Barnhart, 2004 WL
742080, *8 (N.D. Ill. April 1, 2004)("[W]hen it is not possible
to separate the mental impairment documented in the evidence,
from the drug or alcohol abuse, then 'a finding of 'not material'

would be appropriate.'")(citing Clark v. Apfel, 98 F.Supp.2d 1182, 1185 (D.C. Ore. 2000)).

Wright argues that the record was devoid of evidence suggesting a period of time when he was not dependent on alcohol and that he has been consistently dependent on alcohol since 1975. He therefore concludes that the ALJ could not find his substance abuse as a contributing factor as a matter of law. The Commissioner responded that Wright reported to Dr. Durak that he did not abuse any substances, and the record therefore depicted a period of time during which Wright was not dependent on substances.

Separating a mental impairment from the claimant's substance abuse is one of the most difficult tasks an ALJ is charged with. Salazar v. Barnhart, 468 F.3d 615, 624 (10th Cir. 2006). The ALJ must consider the period when the individual was not using drugs and alcohol, including the length of the period of abstinence, and how the mental impairment improved during this period. Salazar, 468 F.3d at 624 ("Some of the most useful evidence in [drug and alcohol abuse] cases 'is that relating to a period when the individual was not using drugs/alcohol,' including the 'length of the period of abstinence.'"). In considering the Commissioner's teletype instructions on how to address drug and alcohol dependence when considering whether a claimant is disabled, the court

noted that "where the record is devoid of any medical or psycho-
logical report, opinion, or projection as to the claimant's
remaining limitations if she stopped using drugs or alcohol, an
ALJ should 'find that [drug and alcohol abuse] is not a contrib-
uting factor material to the determination of disability.'"
Salazar, 468 F.3d at 624.

In remanding the ALJ's decision in Salazar, the court found
that the ALJ's determination that the claimant would not be
disabled absent her drug and alcohol dependency was not substan-
tially supported by evidence because it was based solely on an
anecdotal comment from one physician and a single statement from
another that the claimant's remaining mental limitations would
not be disabling in the absence of the claimant's drug and
alcohol dependency.  Salazar, 468 F.3d at 624-25.  Similarly, in
Kangail, 454 F.3d at 628, a claimant suffering from bipolar
disorder for over a decade was denied benefits due to drug and
alcohol abuse. The Seventh Circuit reversed the ALJ's denial of
benefits, noting that the ALJ incorrectly inferred that improved
periods in the claimant's medical record simply were due to
abstinence from drugs and alcohol. Kangail, 454 F.3d at 629.

Here, the ALJ's determination that Wright would not be
disabled if he ceased his dependence on drugs and alcohol fails
on two grounds.  First, the ALJ's finding that Wright ceased his

dependence on alcohol was not supported by the evidence of record. The record was littered with proof that Wright abused alcohol on a daily basis, and the only evidence suggesting otherwise was Wright's report to Dr. Durak that he did not abuse substances. However, Wright also reported to Dr. Durak that he never abused alcohol, which was contrary to the significant information of record. The ALJ ignored Wright's clearly erroneous statement and chose to point to this individual examination as proof that Wright ceased his addiction for a period of time. Not only was this statement clearly erroneous, but it was not enough to support the in depth analysis the ALJ must make to separate the claimant's mental impairment from his drug and alcohol abuse. Salazar, 468 F.3d at 624-25. It is impossible to discern from this one consultative examination how long Wright ceased his substance dependence and what effect that had on his abilities. The record was devoid of any medical or psychological reports, opinions, or projections as to the claimant's remaining limitations if he stopped using drugs or alcohol.

Because the ALJ could not find from this evidence how long Wright ceased his dependence on alcohol and how his abilities changed, he could not accurately conclude that Wright would not be disabled absent his dependency. Neither medical expert nor any of Wright's treating physicians found that Wright ceased his

substance abuse for a prolonged period of time or explained what his abilities would be absent such reliance. The ALJ ignored the myriad of evidence explaining that Wright had a long-standing alcohol abuse problem. Therefore, the ALJ's conclusion that Wright would not be disabled absent his dependence on alcohol and illegal substances was not supported by substantial evidence of record.

_____

Based on the foregoing, the court RECOMMENDS that the petition for judicial review of the decision of the Commissioner of Social Security filed by the claimant, John Wright, on January 12, 2010, be AFFIRMED with respect to the ALJ's development of illiteracy in the record and REMANDED to determine whether Wright meets Listing 12.05 and whether there was a period of time during which Wright ceased his substance abuse.

Pursuant to 28 U.S.C. §636(b)(1), the parties shall have ten (10) days after being served with a copy of this Recommendation to file written objections thereto with the Clerk of Court, with extra copies e-mailed to the Chambers of the Honorable Theresa L. Springmann, Judge of the United States District Court, Fort Wayne Division, and the Chambers of United States Magistrate Judge Andrew P. Rodovich, Hammond Division. The failure to file a timely objection will result in the waiver of the right to

challenge this Recommendation before either the District Court or the Court of Appeals. Willis v. Caterpillar, Incorporated, 199 F.3d 902, 904 (7th Cir. 1999); Johnson v. Zema Systems Corporation, 170 F.3d 734, 739 (7th Cir. 1999); Hunger v. Leininger, 15 F.3d 664, 668 (7th Cir. 1994); The Provident Bank v. Manor Steel Corporation, 882 F.2d 258, 260-61 (7th Cir. 1989); United States v. Johnson, 859 F.2d 1289, 1294 (7th Cir. 1988); Lebovitz v. Miller, 856 F.2d 902, 905 n.2 (7th Cir. 1988).

ENTERED this 31st day of March, 2011

s/ Andrew P. Rodovich
United States Magistrate Judge